**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Richard P. Matsch**

Civil Action No. 12-cv-00859-RPM

FOREST DARYL TEMPLETON,

    Plaintiff,

v.

H. THOMAS FEHN,
ORLY DAVIDI,
GREGORY J. SHERWIN,
FIELDS, FEHN & SHERWIN, and
CATLIN SPECIALTY INSURANCE COMPANY,

    Defendants.

---

**MEMORANDUM OPINION AND ORDER ON PLAINTIFF'S FIFTH AND SIXTH
CLAIMS FOR RELIEF**

---

Plaintiff Daryl Templeton sold risky securities to Robert and Lisa Cordaro ("the Cordaros"), and, when the investments went bad, the Cordaros filed claims against Templeton and others with the Financial Industry Regulatory Authority ("FINRA"). Following a hearing that Templeton did not attend, a panel of FINRA arbitrators awarded the Cordaros $500,000 in damages, plus interest and costs. Templeton ultimately paid the Cordaros $555,000 to satisfy their claims against him. He then initiated this action against Catlin Specialty Insurance Company ("Catlin"), among others, based on the errors and omissions insurance policy he had with Catlin ("Catlin Policy" or "Policy").

Templeton moved for summary judgment on his Fifth Claim for Relief, seeking indemnity from Catlin under the Catlin Policy. [Doc. 67.] According to Templeton, he was

clearly an "Insured" under the Catlin Policy; Catlin received notice of the Cordaros' FINRA claims within the timeframe of the Policy coverage period; and the FINRA panel found Templeton liable in part because of the "wrongful acts" he committed in selling the Cordaros a $100,000 security in Medical Provider Financial Corporation IV ("MedCap" IV") in July 2007, while he was working for CapWest Securities, Inc. ("CapWest"), the Named Insured under the Policy.  [Doc. 67 at 22-23.]  Templeton contends that Catlin owes him indemnity for the $100,000 in liability he incurred for that sale.  [Id. at 23.][1]

Catlin responded to Templeton's motion for partial summary judgment on the indemnity issue [Doc. 76].  Templeton filed a Reply [Doc. 79].  Catlin then filed a motion for summary judgment [Doc. 84], seeking judgment in *its* favor on Templeton's Fifth Claim for Relief, and on its counterclaim against Templeton [Doc. 60], which seeks a declaration that Catlin does not owe Templeton indemnity under the Policy, and recovery of attorneys' fees and costs.

Catlin also seeks summary judgment [Doc. 91] on Templeton's Sixth Claim for Relief, alleging that Catlin breached its duty to defend him under the Catlin Policy.  Templeton has filed a cross motion for summary judgment on his Sixth Claim for Relief [Doc. 102].

## A.  Undisputed Facts[2]

Templeton was a broker and registered representative for United Securities Alliance, Inc. ("United Securities") from February 14, 2002 through September 15, 2005.  [Doc. 67, Exs. 1 & 3.]  During that time, he established a broker-customer relationship with the Cordaros and sold them the following securities:

---

[1] In addition to seeking $100,000 in indemnity, Templeton requests statutory interest from April 11, 2011 onward.

[2] Catlin admits the facts set forth in this section for the purposes of these motions only.  [See Doc. 76 at 5.]

- <u>June 2004:</u> Triple Net NNN 2003 Value Fund LLC ("Triple Net"):  $150,000;

- <u>June 2004:</u> DBSI State Offices LLC ("DBSI"): $100,000;

- <u>June 2004:</u> Medical Provider Financial Corporation II ("MedCap II") Note #10309: $100,000 (fully matured and paid out June 2007);[3]

- <u>June 2004:</u> MedCap II Note #10310: $130,000 (fully matured June 2009 and currently in default); and

- <u>August 2005:</u> MedCap II Note #12992: $35,000 (fully matured in August 2008 and currently in default).

[Doc. 67, Exs. 2 and 3.]

On September 16, 2005, Templeton started working at CapWest as a licensed security broker and registered representative.

When the Cordaros' investment on MedCap II Note #10309 matured in June 2007, they worked with Templeton to roll over the $100,000 into the MedCap IV Note.  CapWest was the broker-dealer on that transaction.

In the fall of 2008, the Cordaros stopped receiving payment on their investments.  In July 2009, the U.S. Securities & Exchange Commission ("SEC") brought suit in federal court against Medical Capital Holdings ("MedCap") and its principals for violating federal securities laws, and asked the court to appoint a receiver.  The District Court for the Central District of California issued an order appointing a temporary receiver for MedCap on August 3, 2009 and appointed a permanent receiver on August 17, 2009.  The August 3 and 17, 2009 orders froze MedCap's assets.

---

[3] Medical Capital Holdings, Inc. was the parent company of MedCap II and of MedCap IV.

Effective September 1, 2009, Templeton and CapWest purchased errors and omissions coverage from Catlin.  Templeton paid a $2,100 premium for the coverage.  [Doc. 67, Ex. 4.] The Catlin Policy provided:

A.  Indemnity

The **Insurer** shall pay, on behalf of an **Insured, Damages** which the **Insured** becomes legally obligated to pay because of a **Claim** that is both made against the **Insured** and reported to the **Insurer** in writing during the **Policy Period** . . . for a **Wrongful Act** committed solely in the rendering or failing to render **Professional Services** for a **Client,** provided:

1.  Such **Wrongful Act** occurred on or after the **Retroactive Date** . . . . (¶ I. A.)

[Doc. 84, Ex. N at 3 (Policy § I.A.).]  Templeton, as an "Insured Registered Representative," and CapWest, as the Policy's "Broker/Dealer," were "Insureds" under the Policy.  The term "Wrongful Act" was defined as "a negligent act or omission . . . committed by an Insured in the rendering of Professional Services."  [Id. at 9 (Policy § II.V.).]  "Professional Services" included "the sale, attempted sale or servicing of Securities that are approved and authorized by and actually distributed through the Broker/Dealer."  [Id. at 8 (Policy § II.Q.a.iv.).]  The "Retroactive Date" of the Policy was defined to be the later of January 1, 2005, or the date when the Insured Registered Representative entered into an uninterrupted or continually renewed contract with the Broker/Dealer.  [Id. at 9 (Policy § II.T.2.).]  Templeton began working at CapWest on September 16, 2005.  Thus, the Policy covered liability of Templeton for claims brought and reported to Catlin within the policy period (September 1, 2009 through August 31, 2010) for any negligent act or omission Templeton committed in selling, attempting to sell, or servicing securities on or after September 16, 2005.  The Policy contains exclusions to coverage, two of which – the interrelated-wrongful-acts exclusion, and

the insolvency/receivership exclusion ("Exclusion N") – are relevant here and will be reproduced and discussed below.

The Policy imposed a duty to defend on Catlin, as well:

B. Defense

The **Insurer** shall have the right and duty to defend any civil litigations or arbitrations against the **Insureds** that are covered by this Policy. At its discretion, the **Insurer** may appoint counsel to represent the Insureds for any other matters that constitute **Claims** that are covered by this Policy. The **Insurer**, however, does not have a duty to defend such other matters. The **Insurer** shall appoint counsel of its selection to defend the **Insureds** and pay associated **Defense Expenses**.

[Id.] Thus, Catlin had a "right and duty to defend any civil litigations or arbitrations against" Templeton and CapWest that were covered by the Policy. The Policy had a $500,000 coverage limit, which included defense costs, for claims arising from the sale of private placements (also known as "alternative investment products"), subject to a $100,000-per-claim self-insured retention. The products Templeton sold the Cordaros fell into that category of investments.

On November 18, 2009, the Cordaros initiated arbitration proceedings with FINRA against Templeton, United Securities, CapWest and others for Templeton's sale of the securities described above. CapWest received the Cordaros' Statement of Claim on February 4, 2010. David Smith, CapWest's Chief Compliance Officer, said that it "[l]ooks like we had [the] $100,000 sale of Medical Capital IV. Nothing else appears to be ours." [Doc. 67, Ex. 6.] A week later, CapWest reported the Cordaros' Statement of Claim to the Catlin claims office. [Doc. 67, Ex. 7.]

The Cordaros' Statement of Claim described Templeton's sales of securities to the Cordaros while he was with United Securities, and said, in regard to Templeton's 2007 sale of the MedCap IV Note while at CapWest:

> In 2007, when the [MedCap II Note #10309] in the amount of $100,000 matured, respondent Templeton induced claimants to roll it over into a new, 7 year note for the same amount. By that time[,] Templeton was working for another broker dealer, CapWest Securities, which is named as a respondent herein by virtue of the offer and sale of that note to claimants.
>
> . . .
>
> When they opened their account at CapWest, claimants specifically told Templeton and the firm that preservation of capital was their primary investment objective. For this fact alone, CapWest and Templeton should have known that this investment was too risky for these claimants or any other customer who was not a speculator.

[Doc. 67, Ex. 2 at 4.]

Catlin's attorney, Richard Rogers, sent Templeton a letter on May 5, 2010, stating that Catlin would defend him against the Cordaros' FINRA claims subject to a full reservation of rights under the Policy. Catlin retained the firm of Markun Zusman & Compton, LLP ("Markun Zusman") to represent CapWest and Templeton in connection with the Cordaro matter and to represent CapWest and other registered representatives in other pending arbitrations. Markun Zusman filed an answer to the Cordaros' Statement of Claim on CapWest and Templeton's behalf. [Doc. 84, Ex. K.] The answer pertained to all of the Cordaros' claims against Templeton, including those arising out of the investments he sold to them while he was employed at United Securities.

On November 5, 2010, Markun Zusman withdrew as legal counsel in the Cordaro matter after CapWest objected to the amount of Markun Zusman's legal bills and raised other issues

concerning its representation.  [Doc. 80, Ex. 14 at 1-2.]  Four months passed.  In early March 2011, Catlin proposed that Fairfield Woods, P.C. represent CapWest and its registered representatives in the arbitrations against them, including the Cordaro matter.  Dale Hall, President and CEO of CapWest, rejected that proposal and insisted, over Catlin's objection, that CapWest's general counsel Tom Fehn and the law firm of Fields, Fehn & Sherwin ("FF&S") handle those matters.  Rogers testified at deposition that Catlin believed FF&S would represent Templeton in the Cordaro matter because FF&S was replacing Markun Zusman, which was representing Templeton before its withdrawal.[4]  Catlin did not communicate with Templeton directly during this time concerning replacement counsel.  Catlin and CapWest's dispute regarding replacement counsel is set forth in detail below.

In February and March of 2011, Templeton corresponded solely with Dale Hall regarding the status of the FINRA hearing and settlement negotiations with the Cordaros.  Hall told Templeton that Tom Fehn was representing him at that time.  Templeton did not speak to Rogers of Catlin or Fehn of FF&S directly.

Before the Cordaro arbitration hearing set for March 29, 2011, Dale Hall requested authority from Catlin of up to $15,000 to settle the matter.  Rogers granted Hall's request "in good faith" on March 7.  [Doc. 80, Ex. 13 at 2.]  On March 25, Orly Davidi, an FF&S associate, reached an oral agreement with Irwin Stein, the Cordaros' representative, to settle their claim regarding the MedCap IV Note for $13,500.  When Davidi asked Stein to confirm that the settlement was with "all parties," Stein stated that the Cordaros only agreed to settle

---

[4] Templeton argues that Rogers' deposition testimony that he believed FF&S would represent Templeton is not credible because Rogers refused to pay FF&S to represent CapWest on the basis that FF&S was not suitable to handle the FINRA arbitration and, as general counsel to CapWest, had potential conflicts of interest with CapWest's registered representatives, like Templeton.  [Doc. 99 ¶ 13.]  Rogers' belief that FF&S would represent Templeton and his stated position on FF&S's suitability as counsel to CapWest are not inconsistent with one another.  He raised Catlin's objections to FF&S, and Dale Hall made it clear that FF&S was going to represent CapWest regardless.

with CapWest, not with Templeton.  Davidi advised FINRA that day that the settlement was with regard to the claim against "CapWest Securities, Inc. **only**."  [Doc. 67, Ex. 13 (emphasis in original).]  Stein notified FINRA Dispute Resolution that day that they were dismissing their claim against CapWest with prejudice; their claims against Templeton were not mentioned.  [See Doc. 80, Ex. 25 at 5.]

Neither Orly Davidi nor Tom Fehn informed Catlin or Templeton that the Cordaro settlement was with CapWest only.  FINRA sent Templeton a notice of the CapWest settlement, but the notice went to an outdated address in New Mexico.  Templeton had provided FINRA an updated mailing address in South Dakota in December of 2010 and asked that the address be used for all arbitration-related mail.  [Doc. 99, Ex. 4.]  He also provided his e-mail address and said it was a better place to reach him, as he traveled frequently.  [Id.]  In February of 2011, however, Andrew Harris of Markun Zusman, who had been representing CapWest and Templeton, e-mailed FINRA and stated, erroneously, that Templeton's address was a post-office box in New Mexico.  [Doc. 99, Ex. 5.]

Dale Hall informed Templeton and Rogers that the Cordaro arbitration had settled on March 28, 2011.  Unbeknownst to Templeton and Catlin, the FINRA arbitration proceeded the following day.  The Cordaros and Irwin Stein appeared at the FINRA hearing.  Templeton, believing the matter had settled, did not appear.  United Securities did not appear, either; the Court does not know why.

During his opening statement, Stein stated that the Cordaros' claims were based on the DBSI, Triple Net, and MedCap securities they purchased from Templeton.  He also said that the Cordaros' theories of liability against Templeton were failure to use due diligence to investigate the investments before he sold them to the Cordaros, that the Cordaros were

unsuitable investors for the investments, that Templeton failed to disclose material facts about the investments, and fraud.  [Id. at 13:16-16:5.]

Robert Cordaro was the only person who testified at the hearing.  He stated that, on June 17, 2004, while Templeton was working for United Securities, he sold the Cordaros securities in DBSI, Triple Net, and MedCap II, for a total investment of $480,000 [id. at 31:2-19]; and that United Securities served as the broker-dealer for the transactions [Doc. 76 ¶ 23].  Cordaro testified about Templeton's lack of due diligence regarding those investments [id. ¶¶ 24-26], and stated that Templeton had prior information indicating that the Cordaros were not suitable investors for the products [id. ¶ 28].

Cordaro also testified that he invested an additional $35,000 in MedCap II in August 2005, while Templeton was still with United Securities.  [Doc. 76, Ex. H at 65:20-66:8, 70:16-20, 88:7-89:14, 91:8-92:3.]

With regard to the MedCap IV Note, Cordaro testified that when the MedCap II Note #10309 matured in July 2007, he reinvested or "rolled over" the $100,000 into MedCap IV.  [Doc. 76, Ex. H at 104:25-105:11.]  Cordaro said that Templeton encouraged him to reinvest the $100,000 quickly once the MedCap II Note matured.  [Id. at 62:4-16.]  Cordaro assented to one of the arbitrators' characterizations of the MedCap IV reinvestment as "just a repetitive-type thing[.]"  [Id. at 80:4-6.]

When asked about his investments collectively, Cordaro testified that he and his wife went ahead with them in spite of high risks because Templeton repeatedly assured them that the investments were safe.  [Id. at 83:13-84:13.]

At the end of the hearing, when asked for an accounting of the damages the Cordaros were seeking, Stein stated:  "I show 100,000 in DBSI; 150 in Triple Net; . . . 265 in Medical

Capital, which I added to 515." [Id. at 106:13-15.]  Stein then acknowledged that $515,000

should be reduced by $13,500 to reflect the settlement the Cordaros reached with CapWest.

[Id. at 113:21-114:3.]  Thus, the Cordaros sought $502,500 in compensatory damages.

On April 11, 2011, the arbitration panel issued a written decision in the Cordaros' favor.

The arbitrators said that "[t]he causes of action relate to multiple investments in various

securities, including but not limited to, DBSI State Office Fund, LLC, Triple Net (NNN)

Value Fund LLC, and Medical Capital Corporation." [Doc. 84, Ex. L.]  The panel awarded

the Cordaros $500,000, together with interest on $400,000 of the damages award at the New

Mexico statutory rate of 8.75% per annum accruing from October 1, 2008 until March 29,

2011, as well as filing fees and hearing costs.  Templeton and United Securities were held to

be jointly and severally liable.  The panel declined to award punitive damages.

On May 4, 2011, Templeton e-mailed Andrew Harris, his former attorney with Markun

Zusman, seeking advice about how to appeal or vacate the FINRA award, and asking if

Markun Zusman might consider representing him in that effort.   Harris forwarded

Templeton's e-mail to Amir Tadjedin, another Markun Zusman attorney.  On May 9, 2011,

Tadjedin forwarded Templeton's e-mail to Richard Rogers and Joe Mooney of Catlin, and

stated as follows:

> Below for your records is the email we received from former Capwest rep Daryl
> Templeton. As I mentioned to [Rogers], Fehn apparently settled the case [without] even
> attempting to get a release of [Templeton]. I spoke to opposing counsel, and he passed on
> the following info:
>
> 1) [Templeton] was apparently specifically carved out of the release w/ Capwest (which
> frankly is shocking).
> 2) He thinks Fehn/Capwest will renege on the settlement they reached w/ his client
> 3) Fehn did not return any calls
> 4) On another matter Fehn sent a poorly prepared associate to handle the hearing.
> 5) Capwest did not respond to any discovery requests.

> Obviously, all of these things are disconcerting. I asked opposing counsel to hold off on collection efforts until we all collectively figure out[] what if anything can be done. As I mentioned to [Rogers], I may be able to resolve this for some additional sum paid to the other side, but we need to get the coverage issue resolved quickly.

[Doc. 91, Ex. E at 10-12.]

The next day, May 10, 2011, Rogers e-mailed Dale Hall stating that he (Rogers) had learned about the award against Templeton in the Cordaro arbitration. Rogers asked Hall for a copy of the settlement agreement reached on March 25, 2011. [Id. at 13.] Hall responded the next day, as follows:

> You may be assuming, as I did, that the Cordaro v. CapWest, et al., as you have titled it, was a case involving only CapWest and Daryl Templeton. The case was actually titled "Cordaro v. United Securities Alliance Inc.; Michael Jones; Patrick Sutherland; Ronald Bloomingkemper; Forrest D. Templeton; and CapWest Securities, Inc." Tom Fehn offered and had the agreement, with your authority to settle for up to $15K, to settle the case for CapWest and Daryl Templeton for $13.5K for the amount that included CapWest. As I am sure you would agree, he had no authority to settle for anyone else.

> I told Daryl that we had settled the case, meaning CapWest's part of the case, not realizing there were other respondents involved. I did not instruct him not to attend but would understand how he may have interpreted it. I have suggested to Daryl that he attempt to locate United Securities Alliance and that he may want to enlist an attorney to petition the arbitration panel to clear up any misunderstanding.

> The claimant's representative was upset that we had included Daryl Templeton in the settlement for the CapWest portion. This is indeed an unfortunate turn of events, however it was nothing more than a misunderstanding on both my part and Daryl's.

[Id. at 14-15.] Rogers replied to Hall that day and again asked him to provide documentation showing that the Cordaro settlement included Templeton.

The Cordaros filed a complaint in New Mexico state district court on May 27, 2011 to enter judgment against Templeton and enforce the arbitration award. [Doc. 67, Ex. 17.] Templeton's counsel (identity not stated) did not move to vacate or set aside the FINRA award during the proceeding.

11

Templeton then retained Ben White as his attorney (it is unclear when, exactly).  White e-mailed Rogers of Catlin, Hall of CapWest, and Orly Davidi of FF&S on June 14, 2011 alerting them that the Cordaros' representative was willing to settle their claims against Templeton for $485,000.   White asked that Catlin, CapWest, and FF&S "put together a counter-proposal to take back to the Cordaros' attorney, and to take any and all steps to resolve this matter[,]" failing which Templeton would initiate litigation against them.  [Doc. 99, Ex. 13 at 2-3.]  Rogers responded to White by e-mail on June 20, 2011 (with Hall and FF&S copied), stating:

> [A]s we discussed, Catlin did provide . . . Mr. Templeton and CapWest[] with a defense in this arbitration, subject to full reservations of rights. The Insureds, however, raised objections to fee statements for the firm that they originally agreed to undertake the defense, and while these fees were still subject to a self-insured retention under the Catlin policy. That resulted in the original firm withdrawing from the Insureds' representation, which was to be taken over by the other firm that CapWest had requested. Catlin's understanding was that the new firm would represent both Insureds. Moreover, as per CapWest's request, settlement was also agreed to by Catlin as to both Insureds. It appears from your statements below that something may have gone wrong with implementing the defense and settlement of the Insureds, in accordance with the understandings of Catlin and CapWest.   Nevertheless, Catlin is still amenable to resolution of this matter, if possible, in a manner consistent with the terms of the policy, and with any other culpable parties participating in same.

[Doc. 91, Ex. E at 21.]  On June 28, Dale Hall proposed that White approach FINRA and ask that the award be set aside.  [Id. at 22.]  White rejected that proposal, stating that "there was absolutely zero chance that FINRA would 'set aside' the award."  [Id. at 23.]  Fehn and Rogers agreed that Hall's proposal was unlikely to succeed.  [Id. at 23-24.]  Templeton testified at his deposition that he decided not to pursue vacating the FINRA award because White told him "that the odds of getting it vacated were nil, and his advice was don't even try."  [Doc. 91, Ex. A at 108:24-109:1.]

From July-September 2011, both Richard Rogers and Ben White tried to settle the FINRA award with the Cordaros.  The lowest offer the Cordaros made was for $450,000. [Doc. 99, Ex. 14 at 2.]

On January 31, 2012, the New Mexico district court confirmed the arbitration award against Templeton for $500,000, plus $87,260.27 interest, plus arbitration fees of $3,975, and 8.7% interest on $503,975 from April 12, 2011 forward.  [Doc. 67, Ex. 24.]

On September 25, 2012, Templeton entered into a settlement agreement with the Cordaros that required him to pay $555,000 cash to the Cordaros in satisfaction of their judgment.  [Doc. 67, Ex. 27.]  Templeton paid that amount in full on October 25, 2012.

**B.  Duty to Indemnify**

Catlin makes three arguments as to why it does not owe Templeton indemnity under the Policy:  (1) the Policy's general coverage provision does not apply to Templeton's liability to the Cordaros because the liability was based on wrongful acts he committed before the Policy was in effect; (2) the Policy's interrelated-wrongful-acts exclusion applies because Templeton's sale of the MedCap IV Note in 2007 was interrelated with the wrongful acts he committed before the Policy was in effect; and (3) Policy Exclusion N applies because the Cordaros' claims arose out of MedCap becoming insolvent and placed in receivership.

The Court will assume that the actual basis for Templeton's liability to the Cordaros included Templeton's sale of the MedCap IV Note to the Cordaros while he was with CapWest.

The Catlin Policy's interrelated-wrongful-acts exclusion provides:

    III.    This Policy shall not apply to and the Insurer shall pay neither Damages nor Defense Expenses for any Claim:

13

> D.   arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving:
>
> . . .
>
> > a.   any Wrongful Act occurring on or after the Retroactive Date, which, together with a Wrongful Act occurring on or prior to such Retroactive Date, would constitute Interrelated Wrongful Acts.

[Doc. 84, Ex. N at 9.]   The term "Interrelated Wrongful Acts" is defined as any wrongful acts that are:

> 1.   similar, repeated or continuous; or
> 2.   connected by reason of any common fact, circumstance, situation, transaction, casualty, event, decision or policy or one of more series of facts, circumstances, situations, transactions, casualties, events, decisions or policies.

[Id. at 7.]

Courts applying New York law to interpret interrelated-wrongful-acts provisions ask whether there is a "sufficient factual nexus" between the acts. See Seneca Ins. Co. v. Kemper Ins. Co., 133 Fed. Appx. 770, 772 (2d Cir. 2005).   Here, under the express terms of the Policy, wrongful acts are interrelated if they are connected "by reason of *any* common fact . . . ." [Doc. 84, Ex. N at 7 (emphasis added).]   Several common facts connect Templeton's wrongful acts in 2004 and 2007, as the acts involved the same clients (the Cordaros) and investments in the same company (Medical Capital Holdings, Inc.).   The Policy also provides that wrongful acts are interrelated if they are "similar." [Id.]   The Cordaros' theory of the case establishes that Templeton's conduct in 2004 was similar—and similarly wrongful—to his conduct in 2007.   In both time periods, Templeton had information showing that the Cordaros were not suitable investors for MedCap, given their risk tolerance, and yet

he encouraged them to invest; and he failed to disclose material facts regarding MedCap, such as the prior history of its principals, to the Cordaros.   Robert Cordaro characterized the MedCap IV investment as a rollover and a "repetitive-type thing" from his earlier investments in MedCap II.

Templeton does not genuinely dispute those similarities, and instead tries to emphasize dissimilarities:  namely, that Templeton's 2004 conduct occurred while he was with United Securities, whereas in 2007 he was with CapWest.  The Policy does not require that the acts be "identical," only "interrelated."  Given the Policy's broad definition of "interrelated" and the similarities discussed above, Catlin has established a "sufficient factual nexus" between Templeton's 2004 and 2007 wrongful acts such that they are interrelated.

Templeton claims that because Rogers' May 5, 2010 reservation of rights letter to Templeton and CapWest did not expressly mention the Policy's interrelated-wrongful-acts exclusion, Catlin both (1) waived its right to invoke the exclusion, and (2) is also equitably estopped from invoking it.

 "New York law distinguishes policy defenses, such as failure of the insured to give timely notice to the insurer, from coverage defenses, such as those defenses based on an insuring clause or exclusions. The former may be waived, whereas the latter may not."  Brecek & Young Advisors, Inc. v. Lloyds of London Syndicate 2003, 715 F.3d 1231, 1240 (10th Cir. 2013).  Catlin's failure to explicitly raise the Policy's interrelated-wrongful-acts exclusion in its reservation of rights does not constitute a waiver of its right to invoke the exclusion here.

Templeton's equitable estoppel argument is unpersuasive.  A party claiming equitable estoppel must have relied on its adversary's conduct in such a manner as to change his position for the worse, and that reliance must have been reasonable, in that the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading.  Paese v. Hartford Life & Acc. Ins. Co., 449 F.3d 435, 447 (2d Cir. 2006).  Although Rogers' letter did not specifically invoke the interrelated-wrongful-acts exclusion, the letter explicitly stated that Catlin "reserves its right to deny coverage in the policy, in whole or in part, based on other exclusions in the policy including . . . Exclusion D which applies to claims that were reported or noticed prior to the policy period."  [Doc. 84, Ex. M at 6.] The interrelated-wrongful-acts exclusion is a part of Exclusion D.  The letter concluded:

> This letter, Catlin's continuing investigation and any further activity taken in regard to this matter are subject to a full reservation of rights under the policy, at law and in equity, including, but not limited to, the right to assert at any time that Catlin has no duty to defend or indemnify. Should further developments indicate that there is no duty to defend or indemnity in connection with this matters, Catlin specifically reserves the right to disclaim coverage.

[Id. at 7.]  The Rogers letter's specific reference to Exclusion D and its broad reservation of Catlin's right to deny coverage at any time precludes Templeton from claiming justifiable reliance on the letter.  See Federated Dept. Stores v. Twin City Fire Ins. Co., 807 N.Y.S.2d 62, 67 (N.Y. App. Div. 2006) (reservation of rights letter is a "sufficient preventative to reliance even if the insurer later disclaims on a basis different from the ground originally asserted in the reservation of rights"); see also Pereira v. Gulf Ins. Co., 330 Fed. Appx. 5, 6 (2d Cir. 2009).

Because Templeton's conduct in 2004 predates the Retroactive Date of the Policy, the interrelated-wrongful-acts exclusion applies to bar coverage for Templeton's liability stemming from the 2007 MedCap IV Note sale.

Catlin argues that Exclusion N of the Policy also excludes coverage of Templeton's liability to the Cordaros.  Exclusion N excludes coverage for any claim:

> arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving insolvency, receivership, . . . or inability to pay of . . . any company, organization, entity, . . . direct private placement, . . . or arrangement of any nature in which any Insureds . . . placed or recommended to be placed funds; . . . .

[Doc. 84, Ex. N at 11.]   Under New York law, the "interpretation of 'arising out of' in general liability insurance contracts is indeed broad."   Jewish Cmty. Ctr. of Staten I. v. Trumbull Ins. Co., 957 F. Supp. 2d 215, 229 (E.D.N.Y. 2013) (quoting Purdue Frederick Co. v. Steadfast Ins. Co., No. 601345/04, 2005 WL 1662028, at *5 (N.Y. Sup. Ct. 2005)). The words "arising out of" are ordinarily understood to mean originating from, incident to, or having connection with.   Id.   Case law instructs that the term requires application of a "but-for" causation test.   See Mount Vernon Fire Ins. Co. v. Creative Housing Ltd., 88 N.Y.2d 347, 352–53 (1996).

Catlin maintains that the Cordaros' claims "arose out of" MedCap's "insolvency" and "receivership" within the meaning of Exclusion N because, had MedCap remained solvent and not been placed in receivership, the Cordaros would not have lost their investment due to Templeton's misconduct, and they therefore would have no damages to claim.  [See Doc. 76 at 35.]  In support of its position, Catlin cites two cases holding that exclusions similar to Exclusion N barred coverage for claims even though the claims also arose out of or were based upon an insured's alleged misconduct.  [See Doc. 76 at 36-37.]  In his Reply,

17

Templeton does not address either of those cases.  Instead, he cites a case from the Middle District of Florida for the proposition that a suitability claim accrues as of the date of the purchase of securities, and argues that because Templeton sold the Cordaros the MedCap IV Note in 2007, before MedCap became insolvent or was placed in receivership, the Cordaros' claims accrued before, and therefore did not arise out of, MedCap's insolvency or receivership.  [See Doc. 79 at 12.]  According to Templeton, "[i]t doesn't take a logics professor to know that only an antecedent event can cause a consequence."  [Id.]

The Middle District of Florida was not dealing with an insolvency exclusion in the case Templeton relies on; instead, it analyzed when a claim "accrued" for the purposes of a statute-of-limitations analysis.  Whether the Cordaros' claims accrued for the purposes of a statute of limitations is a different question from whether the claims arose out of MedCap's insolvency or receivership.  The timeline of relevant events here is as follows:  in July 2007, the Cordaros bought the MedCap IV Note; in July 2009, the SEC brought an action against MedCap in the Central District of California and asked the court to place MedCap in receivership; the court appointed a temporary receiver for MedCap on August 3, 2009, and a permanent receiver on August 17, 2009, which had the effect of freezing MedCap's assets; and on November 18, 2009, the Cordaros filed their Statement of Claim with FINRA.  While the Cordaro's claims may have pre-dated MedCap's insolvency and receivership as a matter of statute-of-limitations accrual, in reality the claims followed closely on the heels of MedCap's insolvency and receivership.

The plain language of Exclusion N excludes coverage of the Cordaros' FINRA claims.  Their claims against Templeton certainly "arose out of" MedCap's insolvency and

receivership, because had MedCap not become insolvent and gone into receivership, the Cordaros would have had no damage and thus no reason to seek recovery from Templeton. That interpretation of Exclusion N is consistent with the cases cited by Catlin dealing with similar policy exclusions in similar circumstances.

The Court concludes that the Catlin Policy's interrelated-wrongful-acts exclusion and Exclusion N exclude coverage for the liability Templeton incurred for his sale of the MedCap IV Note to the Cordaros.  Catlin does not owe Templeton a duty of indemnity.

## C.  Duty to Defend

The parties brief the question of Catlin's duty to defend Templeton in three distinct phases:  in the lead-up to and during the FINRA arbitration, the time when an appeal could have been taken, and during settlement negotiations with the Cordaros.

The undisputed facts show that Catlin initially provided a defense to CapWest and Templeton through Markun Zusman beginning in April 2010.  Markun Zusman was also representing CapWest in a number of other matters.  Markun Zusman withdrew in November 2010 after CapWest objected to the amount of Markun Zusman's legal bills and raised other issues concerning its representation.  It is unclear what happened in the four months after Markun Zusman withdrew.

In March 2011, Richard Rogers proposed a new law firm, Fairfield & Woods, but Dale Hall refused and insisted that Tom Fehn and FF&S represent CapWest and its registered representatives in the pending arbitrations.  By an e-mail to Rogers on March 1, 2011 (Tom Fehn is copied), Hall told Rogers that Fehn was representing CapWest in two other matters and requested settlement authority from Catlin for Fehn to offer at an upcoming mediation hearing.  [Doc. 80, Ex. 13 at 4.]  In the same e-mail, Hall said, in regard to the Cordaro

matter:  "The hearing is March 29th. . . . We are requesting authorization of $10,000 to

$15,000 to be able to talk settlement before the hearing date is upon us."  [Id.]  Rogers stated

in a March 7, 2011 e-mail to Hall (Tom Fehn is copied) that:

> [t]he fact that these matters are approaching hearing and mediation dates, and we have
> little substantive information as to their development, as well as assessments of the
> Insureds' exposures, underscores the need for an agreed-to defense counsel approach to
> be put in place immediately.

[Doc. 80, Ex. 13 at 2.]  In the same e-mail, Rogers approved, "in good faith," the settlement

authority Hall previously requested for the Cordaro matter, as well as two others.  [Id.]

The next day, Hall replied to Rogers, objecting to Rogers' refusal to allow Fehn and

FF&S as defense counsel.  One of Hall's main points in advocating for Fehn was that he

would not need to "climb the learning curve" since, "as general counsel, Fields, Fehn &

Sherwin has handled all of the pending arbitrations since the Markun firm quit. . . ."  [Doc.

91, Ex. E at 2.]  On March 28, the day before the Cordaro hearing was to commence, Hall e-

mailed Rogers (Fehn is copied) and said "[O]n Friday afternoon a settlement was reached

with Cordaro for $13,500. Paperwork also coming soon."  [Doc. 67, Ex. 14.]

This sequence of events supports only one reasonable conclusion:  that Catlin did not

breach its duty to defend Templeton in the lead-up to the Cordaro hearing.  Rogers testified

that he believed Fehn had replaced Markun Zusman and was handling the Cordaro matter on

behalf of CapWest and Templeton.  [Doc. 91, Ex. J at 163:15-19.]  That belief was justified.

The scope of Markun Zusman's representation included Templeton.  Hall, as CapWest's

agent, represented to Rogers that Fehn took over "all of the pending arbitrations since the

Markun firm quit," which would logically include the Cordaro matter.  Hall also sought

settlement authority so "we" – he and Fehn, who was copied on the e-mail -- could negotiate

with the Cordaros.  Rogers approved that request.  Hall then informed Rogers that the matter had settled before the hearing took place.  In these circumstances, it is not Catlin's fault or responsibility that Templeton went unrepresented at the FINRA hearing.

The next issue concerns Catlin's duty to defend Templeton after the FINRA award was entered against him.  Catlin argues that, even if Templeton can show that Catlin breached its duty to appeal, he cannot show that the breach caused him damages.  Templeton could prove damages by showing that an appeal would have been successful if prosecuted; in that event, the $500,000 award against him would have been vacated.  A plaintiff bringing a legal malpractice claim on a failure-to-litigate theory must, to establish causation and damages, show that the suit reasonably would have been successful if actually tried on the merits. Fleming v. Lentz, Evans and King, P.C., 873 P.2d 38, 41 (Colo. App. 1994).  Relying solely on EP Acquisition Corp. v. Maxxtrade, Inc., No. 09-CV-193-KSF, 2011 WL 4102114 (E.D. Ky. 2011), Templeton argues that there were grounds for setting the FINRA award aside under the Federal Arbitration Act ("FAA") and New Mexico Arbitration Act ("NMAA") because both laws authorize a court to vacate an award based on "misconduct" by an arbitrator, and the FINRA arbitrators committed "misconduct" by failing to send Templeton notice of the FINRA hearing at his correct address.  [See Doc. 99 at 43-48.]

In EP Acquisition Corp., Defendant Garstka moved to vacate an arbitration award against him on the ground that he was not given adequate notice of the hearing, which constituted "misconduct."  2011 WL 4102114, at *5.  The district court rejected his argument, reasoning that even if notice was sent to an outdated address, Garstka "was aware of the arbitration[,]" he "had no reason to believe the claim against him would disappear of its own accord[,]" he did not make "any effort whatsoever to keep himself apprised of the status of the

arbitration[,]" and "[t]he notice sent by the arbitrators . . . were in conformity with FINRA rules and were sent to the registered service of process agent at the last known address for respondents." Id. at *6-*7.  The court noted that Garstka's "problems in this Arbitration stem from his past reliance on [his business partner] who repeatedly assured him that this matter was being handled by competent legal counsel[,]" and concluded that while Garstka might have some claim against the business partner, "[h]e cannot avoid entry of an award against him . . . by relying on his business partner to take care of him." Id. at *7-*8.

The facts here are similar, and in some respects Templeton was arguably more diligent than Garstka.  Unlike Garstka, Templeton did provide FINRA an updated mailing address in South Dakota in December of 2010 and asked that the address be used for all arbitration-related mail.  [Doc. 99, Ex. 4.]  He also provided his e-mail address and said it was a better place to reach him, as he traveled frequently.  [Id.]  Then, Andrew Harris of Markun Zusman, who had been representing CapWest and Templeton, e-mailed FINRA on February 18, 2011 and stated, erroneously, that Templeton's address was a PO Box in New Mexico.  [Doc. 99, Ex. 5.]  Thereafter, FINRA sent notices to Templeton in New Mexico, his last known address.  [Doc. 99, Exs. 6 & 7.]

Templeton was nonetheless not diligent enough.  He depended on Dale Hall, a non-lawyer, to be the sole source of his information regarding the arbitration, and did not once seek an update directly from Tom Fehn, Catlin, or FINRA; like Garstka, he mistakenly relied on a "business partner to take care of him."  Templeton was aware of the arbitration, as well as the hearing, and he had no reason to believe that the Cordaro claims would magically disappear.  Templeton must have known that the Catlin Policy only covered the MedCap IV Note sold while he was at CapWest and that he was exposed to significant liability for the

sales he made while at United Securities.   His apparent belief that CapWest's settlement would protect him from those other sales is inexplicable.   And although FINRA sent Templeton notices to the wrong address, it was the address given to FINRA by Templeton's former attorney.   Thus, <u>EP Acquisition Corp.</u>'s reasoning indicates that any attempt to set aside the FINRA award on the basis of "misconduct" would have been unsuccessful.   That was the opinion of Ben White, Templeton's attorney in the summer of 2011, who said "there was absolutely zero chance that FINRA would 'set aside' the award[,]" and the apparent view of Templeton's counsel in the New Mexico state court proceeding, who did not seek to have the award vacated under the FAA or NMAA.   Accordingly, Templeton cannot show that a breach of Catlin's duty to appeal the FINRA award caused him damages.

In his Amended Complaint [Doc. 20 at ¶ 69], Templeton claims that Catlin breached its duty to defend him by failing to settle with Cordaros within the coverage limits of his policy. In its Motion for Summary Judgment, Catlin argues that this aspect of Templeton's claim is speculative.   [<u>See</u> Doc. 91 at 41-42.]   Templeton does not discuss this aspect of his duty-to-defend claim in his Response, and does not offer any evidence showing that the Cordaros would have accepted the remaining limits of the Catlin Policy to settle their claims against Templeton.   Indeed, the evidence shows that the Cordaros wanted $450,000 to settle in the summer of 2011, and Templeton's own exhibit shows that there was less than $250,000 left under the Catlin Policy at that time.   [Doc. 91, Ex. X.]   Catlin is entitled to summary judgment on this issue.

**D.  Conclusion**

Upon the foregoing, it is

ORDERED that Plaintiff's Motion for Partial Summary Judgment on his Fifth Claim for Relief for Indemnity Against the Defendant, Catlin Specialty Insurance Company [Doc. 67] is denied, and it is

FURTHER ORDERED that Defendant Catlin Specialty Insurance Company's Motion for Summary Judgment on its Counterclaim Against Plaintiff and on Plaintiff's Fifth Claim for Relief [Doc. 84] is granted, and it is

FURTHER ORDERED that Defendant Catlin Specialty Insurance Company's Motion for Summary Judgment on Plaintiff's Sixth Claim for Relief [Doc. 91] is granted, and it is

FURTHER ORDERED that Plaintiff's Cross-Motion for Summary Judgment Re His Sixth Claim for Relief Against Catlin Re Duty to Defend [Doc. 102] is denied.

Accordingly, the clerk shall enter judgment in Catlin's favor on Templeton's Fifth and Sixth Claims for Relief and dismiss Catlin from this civil action.  Catlin requests "costs and reasonable attorney fees as may be allowed by law."  [Doc. 60 at 13.]  Catlin does not cite any law supporting its request for attorneys' fees.  That request is therefore denied.

Dated:  June 24, 2014.

BY THE COURT:

**s/Richard P. Matsch**
_____
Richard P. Matsch
Senior District Judge